

# IN THE
# TENTH COURT OF APPEALS

## No. 10-13-00209-CV

## IN THE INTEREST OF A.Y. AND P.J.T., CHILDREN

### From the 74th District Court
### McLennan County, Texas
### Trial Court No. 2012-1734-3

## MEMORANDUM  OPINION

After a jury trial, the trial court entered an order terminating Appellant C.T.'s parental rights to her two children, A.Y. and P.J.T.  Raising five issues, Appellant appeals.  We will affirm.

The jury found the following predicate violations as grounds for termination of Appellant's parental rights:  (1) Appellant knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being (Family Code subsection 161.001(1)(D)); (2) Appellant engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being (Family Code

subsection 161.001(1)(E)); and (3) Appellant failed to comply with provisions of a court order specifically establishing actions necessary for the parent to obtain return of the children (Family Code subsection 161.001(1)(O)). The jury also found that termination of Appellant's parental rights was in the children's best interest.

In a proceeding to terminate the parent-child relationship brought under section 161.001, the Department must establish by clear and convincing evidence two elements: (1) one or more acts or omissions enumerated under subsection (1) of section 161.001, termed a predicate violation; *and* (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2013); *Swate v. Swate,* 72 S.W.3d 763, 766 (Tex. App.—Waco 2002, pet. denied). The factfinder must find that both elements are established by clear and convincing evidence, and proof of one element does not relieve the petitioner of the burden of proving the other. *Holley v. Adams*, 544 S.W.2d 367, 370 (Tex. 1976); *Swate,* 72 S.W.3d at 766. If multiple predicate violations under section 161.001(1) were found in the trial court, we will affirm based on any one ground because only one predicate violation under section 161.001(1) is necessary to a termination judgment. *In re T.N.F.,* 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied), *overruled in part on other grounds by In re A.M.,* 385 S.W.3d 74, 79 (Tex. App.—Waco 2012, pet. denied).

### Predicate Violation

In issue one, Appellant contends that there is no or insufficient evidence to support the jury's verdict for each child that she failed to comply with provisions of a court order specifically establishing the actions necessary for the parent to obtain return

of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.[1]

The standards of review for legal and factual sufficiency in termination cases are well established. *In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency). In reviewing the legal sufficiency, we view all the evidence in the light most favorable to the finding to determine whether a trier of fact could reasonably have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable fact-finder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id.*

Appellant admitted at trial that she did not complete her court-ordered service plan; in her own words, she "gave up." But on appeal, Appellant argues that there is no or insufficient evidence that the children were removed based on abuse or neglect of the

---

[1] The trial court's termination order erroneously referred to the "father" on the subsection 161.001(1)(O) ground, but the trial court subsequently entered a nunc pro tunc termination order referring to the "mother" on this ground.

children. More specifically, Appellant asserts that there is no clear and convincing evidence that Appellant "actually" abused A.Y. and that there is no evidence at all of any abuse or neglect of P.J.T.

On April 24, 2012, Tanya McFatridge, who was a Department investigator at the time, was assigned to investigate a confidential report that A.Y. had been physically abused by Appellant—that Appellant had hit A.Y. in the nose and caused a nosebleed. As a part of her investigation, McFatridge researched Appellant's history and learned of Appellant's previous involvement with the Department. The first involvement was in October 2010. Between October 2010 and December 2010, the Department received four call referrals involving Appellant. The allegation in the October 2010 call referral was that Appellant had hit A.Y. in the nose and caused a nosebleed. Another call alleged that Appellant had physically abused P.J.T., who had a bruise on his face and a bruise on his back. The other two allegations involved other family members. Three of the reports were ruled as "unable to determine," and one report against an uncle was "ruled out." McFatridge explained that the three investigations were ruled "unable to determine" because, although the children had visible injuries, they could not provide consistent explanations of what had happened because of P.J.T.'s age and A.Y.'s speech impairment.

Because of those four reports, the Department offered Appellant Family Based Safety Services (FBSS) in February 2011. Appellant received parenting classes, individual counseling, and anger management. Not long after offering these services to Appellant, the Department received yet another referral alleging that Appellant had hit

A.Y. in the face and caused injury. The Department offered services to Appellant over an eight-month period, and after she completed her services, the Department closed its case. About six months later, on April 23, 2012, the Department received the referral resulting in the instant case.

On April 27, McFatridge contacted Appellant and asked her to bring A.Y. to her office. Upon arrival, McFatridge noticed that A.Y., who was age eight, had a "fat," "swollen" lip. McFatridge spoke with A.Y. privately and asked her how she got the swollen lip, and A.Y. first said that she had hit it on the television but then said she did not know how it had happened. Before McFatridge completed her interview with A.Y., Appellant barged into McFatridge's office, "irate" and "screaming and yelling," telling McFatridge that she had no right to ask A.Y. questions. Appellant took A.Y. and left the office.

To continue her investigation and interview of A.Y., a few days later, McFatridge, with law enforcement, went to A.Y.'s school to speak with A.Y. again. A.Y. told McFatridge that Appellant had hit her in the mouth with a closed fist, causing the swollen lip. A.Y. also said that Appellant had hit her in the nose with an open hand and had caused the nosebleed. McFatridge said that the only time that A.Y.'s story deviated was the first time at the Department's office when Appellant was just outside of McFatridge's office.

Appellant came to the school to pick up A.Y., and when she learned that McFatridge was there talking to A.Y., Appellant became "very irate" and was "screaming and yelling." They all agreed to move the meeting to the Hewitt Police

Department, and there they agreed that the children would stay with P.J.T.'s paternal grandmother, Robyn, while the Department continued its investigation, which resulted in a "reason-to-believe" finding. Robyn had been listed first by Appellant as a relative for the children to be temporarily placed with. A few weeks later, Appellant was arrested for injury to a child.

P.J.T., who was age three, initially said that Appellant had hit A.Y. in the nose with an open hand, but he later said that a shampoo bottle had fallen in the bathtub and had hit A.Y. in the nose. Appellant also said that a shampoo bottle had hit A.Y. to cause the nosebleed. Appellant initially denied hitting the children but invoked her privilege against self-incrimination when asked if A.Y. was telling a lie when reporting that Appellant had hit her. Appellant's mother said that she did not see any injury on A.Y. later on the day that Appellant was alleged to have hit A.Y. in the face and caused the nosebleed.

McFatridge concluded that Appellant engaged in conduct that placed the children in danger, that it endangered their physical or emotional well-being, and that the children had been knowingly placed or knowingly allowed to remain in conditions that endangered the children's physical or emotional well-being.

Slade Dickson, the children's therapist, testified that A.Y. told him that her mother had hit her on the face. E.L., Robyn's live-in boyfriend, said that A.Y. volunteered to him that Appellant had been hitting A.Y.

The supreme court recently held:

So while subsection O requires removal under chapter 262 for abuse or

neglect, those words are used broadly. Consistent with chapter 262's removal standards, "abuse or neglect of the child" necessarily includes the risks or threats of the environment in which the child is placed. Part of that calculus includes the harm suffered or the danger faced by other children under the parent's care. If a parent has neglected, sexually abused, or otherwise endangered her child's physical health or safety, such that initial and continued removal are appropriate, the child has been "remov[ed] from the parent under Chapter 262 for the abuse or neglect of the child."

*In re E.C.R.*, 402 S.W.3d 239, 248 (Tex. 2013).[2]

On Appellant's legal insufficiency complaint on the subsection 161.001(1)(O) ground, viewing all the evidence in the light most favorable to the jury's finding, we hold that a reasonable factfinder could have formed a firm belief or conviction that the children were removed for abuse or neglect. For Appellant's factual sufficiency complaint on that ground, after considering the disputed evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that the children were removed for abuse or neglect. Accordingly, the evidence is legally and factually sufficient on the subsection 161.001(1)(O) ground, and we overrule issue one. We thus need not address issues three and four, which complain of the legal and factual insufficiency of the evidence to support termination under subsections 161.001(1)(D) and 161.001(1)(E).

### Best Interest

In issue two, Appellant contends that there is no or insufficient evidence to support the jury's findings that termination was in the children's best interest. In determining the best interest of a child, a number of factors have been considered,

---

[2] In *E.C.R.*, the supreme court plainly held that subsection 161.001(1)(O) can be satisfied by *risk* of abuse or neglect, which would apply to the removal of P.J.T. *See E.C.R.*, 402 S.W.3d at 246-48.

including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley*, 544 S.W.2d at 371-72. This list is not exhaustive, but simply indicates factors that have been or could be pertinent. *Id.*

The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't Prot. & Reg. Serv's.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). The goal of establishing a stable permanent home for a child is a compelling state interest. *Id.* at 87. The need for permanence is a paramount consideration for a child's present and future physical and emotional needs. *In re S.H.A.*, 728 S.W.2d 73, 92 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) (en banc).

Larisa Sheppard, the children's caseworker, recommended that Appellant's parental rights be terminated and that they remain with and be adopted by Robyn; she said that it was in the children's best interest. Sheppard testified that Robyn is meeting the children's needs. Robyn testified that she wants the children to stay with her and that she wants to adopt them.

Dickson, the children's therapist, said that the children are happy in Robyn's home and are thriving; they feel safe with Robyn and are bonded to Robyn, who Dickson said was meeting the children's needs. Dickson believes that it is in the

children's best interest to remain with Robyn, but he thinks that if Appellant "earns her way back" in the future, it would be in the children's best interest for them to have Appellant back in their lives. Robyn also said that she would be willing to let Appellant have a relationship with the children in the future "under certain conditions" and "in baby steps." E.L. said that it would possibly be a good idea for the children to be returned to Appellant in the future if she "stepped up" but that she has not done that to get her children back. E.L. also testified that A.Y. told him that she does not want to go back to her mother because she does not want to get hit. A.Y. was recently waking up crying and with anxiety about possibly going back to her mother.

Robyn, who is a natural grandparent to only P.J.T., testified that she does not see A.Y. any differently and treats A.Y. as her granddaughter. Dickson said it would be a travesty and "another huge loss" to separate the children because of their bond for each other.

Appellant testified that her rights should not be terminated, that she loves her children, and that she looks forward to getting her children back. She said that it was in the children's best interest to not have her parental rights terminated. Because of a pending felony charge for injury to a child pertaining to the physical abuse of A.Y., Appellant had not seen the children in the year before trial because a bond condition prohibited her from seeing them.

Appellant's mother testified that she did not want Appellant's parental rights terminated and that it was in the children's best interest for Appellant to remain in their lives. Appellant's father Gary said that it was best for the children to be back with their

mother. Dana, a friend of Appellant's mother who had observed Appellant with the children, did not think there was any basis to terminate Appellant's parental rights and thought that the children should be returned to Appellant. Dana said that Appellant was an "excellent caregiver" and a "good mom." Dana's daughter Amanda, a friend of Appellant and who also observed Appellant parent the children, said that Appellant was a good mother and that the children should be returned to Appellant. Amanda did not think that termination was in the children's best interest.

*Desires of the children:* Pamela, Appellant's mother, said that A.Y. and P.J.T. expressed to her that they wanted to see Appellant and that they missed her and loved her. Gary testified that the children have asked about Appellant. Dickson said that it is common for abused children to continue to love their parent. *See In re W.S.M.*, 107 S.W.3d 772, 773 (Tex. App.—Texarkana 2003, no pet.) ("Although a child's love of his natural parents is a very important consideration in determining the best interests of the child, it cannot override or outweigh the overwhelming and undisputed evidence showing that the parents placed or allowed the child to remain in conditions, and engaged in conduct or placed the child with persons who engaged in conduct, which endangers the physical and emotional well-being of the child. The child's love of his parents cannot compensate for the lack of an opportunity to grow up in a normal and safe way equipped to live a normal, productive, and satisfying life.").

Sheppard testified that both children are happy in Robyn's home and want to stay there and that they are bonded with Robyn and E.L. Robyn said that A.Y. does not want to see Appellant but that P.J.T. asked to see her—initially often, but over time, it

tapered off. Dickson said that A.Y., who was age nine at the time of trial, initially wanted to see Appellant, but A.Y. told him a couple of weeks before trial that she wanted to live with Robyn and did not want to see Appellant. When asked why, A.Y. said that it was because her mother hits her. A.Y. told Dickson that Appellant was hitting her in the face.

The evidence on this factor is disputed but weighs in favor of the jury's best-interest findings.

*The children's emotional and physical needs now and in the future and the emotional and physical danger to the children:* Evidence of past misconduct or neglect can be used to measure a parent's future conduct. *See Williams v. Willaims,* 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns,* 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue."); *see also In re V.A.,* No. 13-06-00237-CV, 2007 WL 293023, at *5-6 (Tex. App.—Corpus Christi 2007, no pet.) (mem. op.) (considering parent's past history of unstable housing, unstable employment, unstable relationships, and drug usage). We will not repeat here the above-detailed evidence pertaining to Appellant's alleged physical abuse of A.Y.

At the time her service plan was created, Appellant was on felony probation for debit-card abuse, which was revoked, and she served six months in state jail. At the time of trial, Appellant's felony charge for injury to a child was still pending. She had a prior felony charge for unauthorized use of a vehicle, to which she pleaded guilty and was placed on probation, which was revoked and resulted in incarceration soon after A.Y. was born. Appellant's criminal conduct that resulted in the revocation included

charges for four forgeries and a theft by check. Appellant, who was incarcerated for one-third of A.Y.'s life and eight months of P.J.T.'s life, agreed that her going in and out of jail was not stable for the children and was not a good influence for them. Appellant also admitted that she used marijuana for six weeks after the children were removed, and she invoked her privilege against self-incrimination when asked about prior drug use.

A parent's engaging in criminal conduct endangers the emotional well-being of a child because of the parent's resulting incarceration. *See Karl v. Tex. Dept. Prot. & Reg. Serv's.,* No. 03-03-00655-CV, 2004 WL 1573162, at *2-3 (Tex. App.—Austin July 15, 2004, no pet.) (mem. op.); *see also In re R.W.,* 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child").

Dr. James Shinder, a psychologist, did a psychological evaluation of Appellant, and he found it "a major concern" that Appellant did not fully disclose her criminal history to him, and Dr. Shinder had concerns about Appellant's honesty also because she denied being abusive to her child or children. He recommended against reunification and said that it would be dangerous to return the children to Appellant.

Appellant's witnesses testified that Appellant met her children's needs, that they had never seen her endanger the children, and that she was not a danger to them.

The evidence on these factors weighs in favor of the best-interest findings.

*Parental abilities and available programs:* As noted above, Appellant did not complete her service plan. *See In re W.E.C.,* 110 S.W.3d 231, 245 (Tex. App.—Fort Worth

2003, no pet.) (factfinder can infer from parent's failure to work programs offered by Department that parent "did not have the ability to motivate herself to seek out available resources needed … now or in the future."). Robyn and Dickson both thought that Appellant has an anger problem—especially toward A.Y.—and Appellant did not complete the required anger-management and parenting classes before trial, despite Sheppard setting them up for Appellant twice. Appellant's mother admitted that Appellant has anger-control issues, but her father said the Appellant did not have an anger problem. Initially, Appellant was unsuccessfully discharged from individual therapy for her sporadic attendance, but with a new therapist Appellant was consistently attending but had not completed it.

Evidence of a parent's home and job instability can show a lack of parental abilities. *Doe v. Brazoria Cty. Child Prot. Serv's.*, 226 S.W.3d 563, 574 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Appellant was age twenty-nine at the time of trial. She has been married five times to four different men, and she married her most recent husband while he is serving a prison sentence of more than forty years. Appellant agreed that her four divorces have not been stable for the children. When A.Y. was born, Appellant was not working, and she had sporadic employment after that. During the case, Appellant held only one job—delivering newspapers—for a short while (two to three months) and had not worked in the five months before trial. She said she had started a new job just before trial, despite initially testifying that she did not have a job; Appellant said that she forgot she had started the new job just before trial. Appellant has moved approximately twelve times during her children's lives and has been

imprisoned three times. Appellant agreed that it has not been in the children's best interest to live in such a chaotic environment. Dickson said that Appellant's many moves and the exposure of the children to multiple father figures—Appellant's instability—caused the children anxiety.

Appellant's mother said that Appellant has been a "real good mother" and takes care of her children. Appellant's father said that Appellant was a "very good caretaker" of her children and that they are "perfectly safe" with her.

Robyn initiated the children's therapy with Dickson and has never missed an appointment. Robyn has also addressed the children's educational needs, especially for A.Y., who is in special education with a learning disability and a speech impairment, which has improved while in Robyn's care. P.J.T. also has speech problems, and Dickson said that it too is improving. Dickson testified that Robyn's behavior with the children has always been appropriate, that she has demonstrated the ability to implement his suggestions, and that he believes she would seek out other necessary services for the children.

The evidence on these factors weighs in favor of the best-interest findings.

*Plans for child and stability of the home:* The Department's plan was for the children to remain with Robyn, who wants to adopt them. Robyn, who was employed fulltime, took on an additional parttime job to help support the children, and she and E.L. moved into a larger apartment for the children. E.L. also accepted a promotion at work because it meant more money to care for the children, even though he did not particularly want the promotion.

E.L. readily admitted to his criminal history—a DWI in 1984 and another in 2004—but he said that he is not an alcoholic and also admitted to occasionally drinking around the children. He also had two old hot-check cases (in 1988 and 2004) and a 1975 public intoxication arrest. E.L. says he has not used drugs in fifteen years and that he is randomly drug-tested at work. Both Robyn and E.L. said that he has followed the Department's guidelines for his supervision of the children, and E.L. testified that he is bonded to the children and loves them.

Appellant's plan for the children was for them "to finish school." Appellant, who was living with and being supported by her mother, said she would stay home with the children to provide for them.

The evidence on these factors weighs in favor of the best-interest findings.

*Acts or omissions and any excuses for them:* Appellant testified that she could not initially work her service plan because she was incarcerated for six months when this case began and none of the services was available in jail. She was released in November 2012 but did not initiate any services for a couple of months. Appellant admitted that her incarceration was her fault, and she said that she did not complete her services because she "gave up" when the Department decided not to pursue reunification. Appellant had not seen the children in the year before trial because a bond condition for Appellant's pending felony charge for injury to a child prohibited her from seeing them.

The evidence on these factors weighs in favor of the best-interest findings.

*Conclusion:* Viewing all the evidence in the light most favorable to the jury's findings, we hold that a reasonable factfinder could have formed a firm belief or

conviction that termination was in the children's best interest. For Appellant's factual sufficiency complaint on best interest, after considering the disputed evidence, we hold that a reasonable factfinder could have formed a firm belief or conviction that termination was in the children's best interest. The evidence is legally and factually sufficient to support the jury's best-interest findings. We overrule issue two.

### Intervention

In issue five, Appellant contends that the trial court erred in denying the intervention of Appellant's father Gary, the maternal grandfather of the children. The Department asserts that Appellant lacks standing to make this complaint on appeal for Gary, who did not appeal the trial court's ruling. We agree. *See, e.g., In re T.N.*, 142 S.W.3d 522, 524-25 (Tex. App.—Fort Worth 2004, no pet.); *see also Buckholts ISD v. Glaser*, 632 S.W.2d 146, 150 (Tex. 1982) (an appealing party cannot complain of errors that do not injuriously affect that party or that merely affect others). Issue five is overruled.

We affirm the trial court's order of termination.


REX D. DAVIS
Justice

Before Chief Justice Gray,
    Justice Davis, and
    Justice Scoggins
Affirmed
Opinion delivered and filed December 12, 2013
[CV06]